# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

Brezzy Hurst,

                Plaintiff,       Case No. 1:15-cv-03560

v.                          Michael L. Brown
                                     United States District Judge

Steven Youngelson, et al.,

                Defendants.

_____/

## OPINION AND ORDER

Plaintiff Brezzy Hurst ("Plaintiff") was a dancer and entertainer at The Follies club. She filed suit against Defendants claiming they violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* Specifically, she claims Defendants Surrey White, Steven Youngelson, and WBY, Inc. misclassified her as an independent contractor rather than an employee and failed to pay her minimum wages as required by the FLSA.[1] Defendants and Plaintiff filed opposing motions for summary

---

[1] WBY, Inc. is the corporation that does business as The Follies. Defendants White and Youngelson both own fifty percent of WBY. Dkt. 77 at 12:25-13:1; Dkt. 78 at 8:1-3.

judgment as to whether Plaintiff was an employee under the FLSA and whether Defendants White and Youngelson were employers under the Act. (Dkts. 86, 87.) Plaintiff also moved for summary judgment as to enterprise coverage, the creative-professional exception to the FLSA, the offset defense, and violation of the FLSA's minimum wage provisions. The Court grants Plaintiff's motion (Dkt. 86) and denies Defendants' motion (Dkt. 87).

## I. Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "No genuine issue of material fact exists if a party has failed to 'make a showing sufficient to establish the existence of an element . . . on which that party will bear the burden of proof at trial.' " *Am. Fed'n of Labor & Cong. Of Indus. Orgs. v. City of Miami*, 637 F.3d 1178, 1186–87 (11th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

The moving party bears the initial responsibility of asserting the basis for her motion. *Catrett*, 637 F.3d at 323. The movant is not, however, required to negate the non-movant's claim. *Id.* at 324. Instead, the moving party may meet her burden by " 'showing' — that is, pointing to the district court — that there is an absence of evidence to support the non-moving party's case." *Id.* After the moving party has carried its burden, the non-moving party must present competent evidence that there is a genuine issue for trial. *Id.*

The court must view all evidence and factual inferences in a light most favorable to the non-moving party. *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988). But "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48.

## II. Factual Background

The Follies is a restaurant and bar in Chamblee, Georgia, where women dance in the nude to entertain men. (Dkt. 87-1.) The Follies has between 60 and 100 female entertainers with varying numbers working at any one time. (Dkt. 98 at ¶¶ 23, 60.) Plaintiff worked as an adult

entertainer at The Follies from around November 2010 through April 2014.[2] (Dkt. 86 at ¶ 5.) Defendants treated Plaintiff as an independent contractor, allowing her to keep money men paid her to dance for them rather than paying her the minimum wage required by the FLSA. (Dkt. 98 at ¶¶ 8, 36.) Plaintiff claims Defendants misclassified her as an independent contractor under the FLSA and should have treated her as an employee, including by paying her the minimum wage. (Dkt. 29; 86-6.) Plaintiff filed this lawsuit to recover unpaid wages.

## III. Discussion

### A. Employee or Independent Contractor

The FLSA distinguishes between employees and independent contractors. Employees are entitled to be paid a minimum wage and overtime wages; independent contractors are not. *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013). The purpose of the act is to "protect those whose livelihood is dependent upon finding employment within the business of others." *Mednick v. Albert*

---

[2] Defendants claim that time at which Plaintiff worked at The Follies before October 7, 2012 is immaterial. Dkt. 98 at ¶ 5.

*Enterprises, Inc.*, 508 F.2d 297, 300 (5th Cir. 1975).[3] The determination of whether a worker is an employee or an independent contractor is a question of law for the court. *Patel v. Wargo*, 803 F.2d 632 n.1 (11th Cir. 1986). In making this determination, courts apply the so-called "economic reality test," looking beyond labels that the parties may have used and assessing the level of economic independence that the worker actually had from the employer. The ultimate question is whether the worker is so dependent upon the business that she "come[s] within the protection of the FLSA or [is] sufficiently independent to lie outside its ambit." *Usery v. Pilgrim Equip. Co. Inc.*, 527 F.2d 1308, 1311–12 (5th Cir. 1976). Courts often frame this inquiry as "whether the individual is 'in business for [her]self.' " *Stevenson v. Great Am. Dream, Inc.*, No. 1:12-cv-3359, 2013 WL 6880921, at *2 (N.D. Ga. Dec. 31, 2013).

The Court may consider several factors to evaluate the economic reality, including "(1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed; (2) the

---

[3] The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; [and] (6) the extent to which the service rendered is an integral part of the alleged employer's business." *Scantland*, 721 F.3d at 1312. These factors are not exclusive, and no single factor must control. Rather, these factors guide the Court's analysis of economic dependence — the ultimate question being whether the worker was dependent upon finding employment in the business of another or whether the employee was capable of running an independent business. *Usery*, 527 F.2d at 1311.

In conducting this analysis, a court should not assume that a worker is an independent contractor because he or she has some characteristics of an independent contractor. *Mednick*, 508 F.2d at 302. To make this assumption would be to allow employers to get around the goals of the FLSA by granting some independence to workers who are, in reality, dependent upon their employer's business. *Usery*, 527 F.2d at

1311. So when the analysis can go either way, a court must err on behalf of the worker by applying an expansive definition of the term "employee".

Recently, other courts have considered the relationship between adult entertainers and the clubs where they perform, nearly universally finding adult entertainers to be employees. *See Hanson v. Trop, Inc.*, 167 F. Supp. 3d 1324, 1328 (N.D. Ga. Mar. 3, 2016); *Vaughan v. M-Entm't Properties, LLC*, No. 1:14-CV-914, 2016 WL 7365201, at *6 (N.D. Ga. Mar. 15, 2016) (collecting cases).[4] This Court agrees with the weight of authority and, after applying the economic-reality test to the undisputed facts of this case, concludes that Plaintiff was an employee under the FLSA.

_____

[4] The Court is aware of district court cases from outside the Eleventh Circuit finding adult entertainers not to be employees. *See Hilborn v. Prime Time Club, Inc.*, 2012 WL 9187581 (E.D. Ark. July 12, 2012); *Matson v. 7455, Inc.*, 2000 WL 1132110 (D. Or. Jan. 14, 2000). These opinions involve scant analysis of the "economic realities" test. The court in *Hilborn* dedicated just one paragraph to the assessment. The court in *Matson* considered a written agreement the employer required the employee to sign stating she was an independent contractor to be "the most telling indicator of her status." *Matson*, 2000 WL 1132110 at *4. The Eleventh Circuit's precedent expressly states that self-imposed labels are not controlling. The Court rejects the legal reasoning of these two cases.

### 1. The Nature and Degree of Control

The first factor is the nature and degree of the alleged employer's control over how the alleged employee performs her work. Other courts have found that clubs with adult entertainment have control over the work environment of their entertainers. *Hanson*, 167 F. Supp. 3d at 1328 (finding control based in part on the club "setting minimum prices for services, requiring entertainers to tip club employees, and requiring entertainers to report their earnings to the club"); *Vaughan,* 2016 WL 7365201, at *12 (finding control based in part on the fact that the club "exercises significant control over the atmosphere, clientele and operation of the club") (internal citations omitted); *Stevenson,* 2013 WL 6880921 (finding control when plaintiff controlled her own hours on the basis that "in the total context of the relationship . . . the right to set hours [does not indicate] such lack of control by [the defendant] as would show these operators are independent from it.") (alternations in original) (internal citations omitted). Defendants argue that those cases are irrelevant because Plaintiff had more control over her work than those plaintiffs.

Regardless of that comparison, the undisputed facts show that The Follies exercised significant control over Plaintiff's work. When Plaintiff arrived at the club, she was required to park her car with the valet attendant and leave her key with him. (Dkt. 79 at 22:22–24.) She was then required to check in with the house mom and pay a "house fee." (Dkts. 84 at 138:22–25; 98 at ¶ 47.) Defendants used the house fee to control the shifts that dancers worked. The amount of the fee depended on the time an entertainer arrived to work and the time she left. (*Id.* at ¶ 48.) Leaving earlier meant paying higher house fee. (*Id.*) For example, dancers who chose to leave before the 3:00 a.m. closing time paid a higher fee than dancers who chose to stay until 3:00 a.m. This structure certainly incentivized dancers to stay later into the night, entertaining patrons and keeping them at The Follies until closing time.

Defendants also controlled the conditions under which Plaintiff worked. Defendants required Plaintiff to purchase two drink tickets (called "Follies Dollars") every shift she worked. (Dkts. 84 at 30:9–14; 77-1.) She could use the tickets for her own drinks or could sell them to customers. (Dkt. 100 at 10.) But, she had to buy them.

Most of Plaintiff's income came from table dances that she performed for club patrons. (Dkt. 84 at 206:23–24.)[5] She was not free to set the prices she charged customers for table and VIP dances. (Dkt. 98 at ¶ 44.) Defendants set minimum prices for those dances, and she could not deviate from them. (Dkt. 79 at 43:13–18.) They also set the cover charge that customers had to pay for entry into the club. (Dkt. 98 at ¶¶ 13–15.) Plaintiff had no ability to waive or alter the charge for her "customers." Defendants also "had ultimate control over which individuals were allowed to enter The Follies as customers." (*Id.*) Indeed, Defendants prohibited women from coming into the club to see Plaintiff perform unless accompanied by a man. (Dkt. 98 at ¶ 17.) Defendants hired bartenders, waitresses, DJs, and security guards. (Dkt. 79 at 71:22–72:8.) They set the hours of operation. (*Id.* at 68:11–13.) They also determined what behavior was or was not appropriate at the club. (Dkt. 86-3 at ¶ 4.)

---

[5] Plaintiff could also earn money by dancing for patrons in the VIP room, going on stage to dance, and having conversations with customers. (*Id.* at 109:13–19; 206:19–22.) But, again, most of her money came from table dances.

And, once she arrived at work, Plaintiff was not free to leave. As explained above, upon arrival at work, she had to leave her car key with the club's valet attendant. At the end of the night, she was required to take a breathalyzer test in the presence of a house mom or manager. If she passed the test, they gave her a "See Ya" pass. (Dkts. 84 at 336:8–20; 79-1.) She had to present her See Ya pass to the valet attendant to get her keys back so she could leave. (Dkts. 84 at 87:9–12; 79 at 50:6–13.) Defendants instructed the valet attendants not to give dancers (including Plaintiff) the keys to their cars unless they presented a See Ya pass. At closing time, The Follies also required Plaintiff and the other dancers to remain inside until all the customers had left the parking lot. (Dkt. 84 at 85:4–86:2.)

Plaintiff claims she also had to tip out the bar tenders, DJ, and house mom, and get them to sign her See Ya pass to confirm she paid them before she could leave. (Dkt. 84 at 335–337.) The See Ya pass — created by Defendants — has spaces for their signatures, thus supporting her claim. (Dkt. 79-7.) In addition, the DJs kept "sign-in sheets" that listed each dancer and included a space for each dancer labeled "tipped out." (Dkts. 79-11; 79-12; 79-13; 79-14.) It also had a note stating "[t]here

will be no arguing or getting angry with [the e]ntertainers.  If they do not tip correctly, have the Manager talk with them." (*Id.*)  This document supports Plaintiff's claim that she was required to tip the DJ and that The Follies manager had some level of control over her if she failed to do so.  Indeed, the documents are consistent with Plaintiff's testimony that she once failed to tip the DJ but The Follies' manager allowed her to come back to work without any punishment.  (Dkt. 84 at 226:17–228:3.)

Defendants dispute that they required Plaintiff and other dancers to pay these other workers.  (Dkt. 100 at 11.)  In support of this, Defendants cite Plaintiff's admission that the house moms sometimes allowed her to leave without paying them.  She explained, however, that in these situations the house mom expected Plaintiff to pay the amount owed on her next shift.  (Dkt. 84 at 286:16–23.)  Defendants also presented an affidavit from a former dancer and current house mom, Abigail Dunahoo, who averred that tipping was voluntary and customary but not mandatory.  (Dkt. 87-7 at ¶ 9.)  A genuine issue of fact exists as to whether tipping was mandatory or simply customary.[6]  Likewise, a

---

[6] Defendants also submitted a declaration from another former dancer, Zoe Mae Herbst, in support of various assertions, including their claim

genuine issue of fact exists as to whether Plaintiff was required to perform onstage. She claims she was; Defendants claim she was not. (Dkt. 92-2 at ¶ 49.)

It is undisputed, however, that, before she could get her keys and leave, Plaintiff had to pass a breathalyzer test in the presence of a house mom, pay her house fee, and present a See Ya pass to confirm she had done both. (Dkt. 79-16 at ¶ 55.) If Plaintiff did not pass the breathalyzer

---

that tipping bartenders, DJs, and house moms was not mandatory. Plaintiff objected to that declaration as barred by an earlier ruling from the Court. Plaintiff is correct. In the final weeks of discovery, Defendants provided Plaintiff declarations from fifteen former dancers at The Follies, claiming they might be witnesses in this case. The Court ruled that Defendants' late disclosure violated Federal Rule of Civil Procedure 26 and that, pursuant to Rule 37(c)(1), Defendants could not rely on declarations from those witnesses in opposing summary judgment. (Dkt. 82.) Ms. Herbst was not on that list. Defendants did not disclose her as a potential witness until months later when it opposed Plaintiff's motion for summary judgment. The reasoning and result set forth in the Court's previous order applies to the failure to disclose Ms. Herbst during discovery. Indeed, it would make little sense to bar Defendants' reliance on witnesses disclosed at the very end of discovery only to allow reliance on witnesses disclosed even later. The Court will not consider Ms. Herbst's declaration. Even if the Court did consider her declaration, the facts she offered are largely duplicative of information provided by other witnesses, particularly Abigail Dunahoo. Ms. Herbst's declaration — even if considered — would not raise an issue of material fact so as to defeat Plaintiff's motion for summary judgment.

test, the club would keep her car keys and send her home in a cab or with a friend. (Dkt. 84 at 333:19–21.) On occasion, when The Follies closed at 4 a.m. and 100 entertainers needed to check out simultaneously, Plaintiff had to wait to leave for an hour and a half. (*Id.* at 83:22–25.)

All of these rules — requiring Plaintiff to pay a house fee, requiring her to purchase and resell drink tickets, controlling which customers she could entertain, setting minimum prices she could charge for services, controlling the hours of operation, requiring her to jump through hoops to leave, and charging her higher fees if she left early — allowed Defendants to control the circumstances under which Plaintiff was allowed to work. They are relevant to the control analysis and weigh in favor of a finding that Plaintiff was an employee of Defendants rather than an independent contractor working for herself.

These same factors also have been cited by other courts in finding exotic dancers to be employees. *Reich v. Circle C. Investments, Inc.*, 998 F.2d 324, 328 (5th Cir. 1993) (finding that instructing dancers to charge minimum prices for dances indicated control); *McFeeley v. Jackson St. Entm't, LLC*, 47 F. Supp. 3d 260, 269 (D. Md. 2014) (finding that setting the hours of operation for the club indicated control); *Thompson v. Linda*

*And A., Inc.*, 779 F. Supp. 2d 139, 148 (D.D.C. 2011) (finding that having dancers pay a house fee to dance demonstrated control); *Reich v. Priba Corp.*, 890 F. Supp. 586, 592 (N.D. Tex. 1995) (finding that dictating the atmosphere of the club demonstrated control).

Defendants argue that the control they exerted over Plaintiff was insufficient to qualify her as an employee. Defendants point to the disputes about whether she was required to tip DJs and bartenders and whether she was required to perform on stage. They also point to the fact that Plaintiff had no set hours and requirements as to the number of shifts she had to work each week. (Dkt. 88 at 16.) Regardless of these details, the inquiry remains "whether a . . . dancer's freedom to work when she wants and for whomever she wants reflects economic independence, or whether these freedoms merely mask the economic reality of dependence." *Harrell v. Diamond A Entm't, Inc.*, 992 F. Supp. 1343, 1349 (M.D. Fla. 1997). The fact that Defendants did not require Plaintiff to work certain hours does not mean they did not control the circumstances under which she worked. An employee's "right to set hours [does not indicate] such lack of control [by defendant] as would show these operators are independent from it." *Usery*, 527 F.2d at 1312.

Defendants also argue that the house fee did not operate as a "carrot or a stick" that pressured dancers to remain at the club. Instead, they claim that it was "essentially a charge for renting floor space." (Dkt. 98 at ¶ 139.) They claim that the fees "increase at certain times because the demand per square foot increases with the number of entertainers willing to compete for that space and [they] charge more during times that entertainers are willing to pay more." (*Id.*) The notion that Plaintiff rented floor space is absurd — Defendants' silly attempt to redefine reality to avoid the consequences of their conduct. Neither Plaintiff nor any dancer controlled any section, portion, or square footage of the club. They walked throughout it, performing wherever customers wanted them to dance. Defendants introduced no document or evidence to suggest there was any assessment of supply and demand, square footage, or space used in setting the house fees.

The house fees depended on two things — when dancers got to the club and when entertainers left the club. (Dkt. 79 at 74:11–14, 81:15–20, 82:23–83:1.)[7] They incentivized the entertainers to be there during

---

[7] Throughout this matter, Defendants have refused to call Plaintiff a "dancer," insisting that she be referred to as an "entertainer." They

particular hours.  Dancers who chose to leave the club before 3:00 a.m. paid more money than those that chose to leave after 3:00 a.m.  (Dkt. 98 at ¶ 48.)  A supply and demand system would not penalize entertainers for wanting less time to perform.  Defendants also argue that this payment arrangement benefited entertainers as they could take a nap at the club or make more money by continuing to perform.  (Dkt. 97 at 11.) Regardless of the potential advantages to entertainers for staying at work longer, requiring dancers to pay more for leaving early exerts control.

Defendants next argue that the breathalyzer requirement did not establish control because the only consequence of failing the test was having to take a cab home.  (Dkt. 97 at 13.)  The Court rejects this argument.  The breathalyzer requirement placed a constraint on Plaintiff's ability to leave upon her own initiative.  It might also have

---

apparently believe this label somehow distinguished her from the exotic dancers in the other cases cited herein and makes her an independent contractor.  (Dkt. 77 at 26:8–21.)  Of course, the economic realities test exists because a putative employer's labels are not controlling (or even persuasive).  The Court recognizes little difference between the two labels given the realities of the services Plaintiff provided Defendants' business. They dance and they entertain Defendants' customers.  The Court, therefore, uses the terms interchangeably.

increased public safety (making it a good policy) but it exerted control over Plaintiff's working conditions.

Defendants claim the club's managers did not routinely enforce minimum price requirements for dances. As a result, they claim the minimum prices requirement did not actually exert any control over Plaintiff. (Dkt. 97 at 12.) Defendants set this rule, and absent evidence that Plaintiff knew Defendants did not enforce it (and no such evidence has been presented), the rule controlled her behavior. The requirement of minimum prices, enforced or not, controlled Plaintiff's work at the club. *See Vaughan,* 2016 WL 7365201 at *7 ("However, simply because a manager may be kind, and may decide not to strictly enforce every rule on every occasion, does not change the fact that the manager is exercising control over the subordinate.").

Defendants next contend that that their control of the hours, employees, and clientele had no impact on Plaintiff's earning potential and thus did not constitute a form of control. (Dkt. 97 at 9.) The Court rejects this argument. "Defendants created and control the atmosphere and surroundings at [the club], the existence of which dictates the flow of customers into the club. An entertainer can be considered an

independent contractor only if she exerts such a control over a meaningful part of the business that she stands as a separate economic entity." *Reich*, 890 F. Supp. at 592 (internal citations and quotations omitted). And here, "the entertainer's economic status is inextricably linked to those conditions over which defendants have complete control." (*Id.*) Plaintiff had no control over when customers could enter the building, which customers could enter, what cover charge they paid, or the minimum fee for a dance. Defendants exercised complete control over this important aspect of the business — the customers.

It is true that Defendants did not control some elements of Plaintiff's work. (Dkt. 97 at 6.) Plaintiff, for example, was not required to dance for customers while at the club, but rather could spend her time drinking, playing games, talking to customers, or even taking a nap. (*Id.*) She also decided how to dress, whether to wear a wig, and how to interact with customers. (*Id.*) "The mere fact that [the club] has delegated a measure of discretion to its dancers about how best to entertain its customers does not necessarily mean that its dancers are elevated to the status of independent contractors. Indeed, one could say that the nature of [an entertainer's] job requires some measure of discretion and

flexibility." *Harrell*, 992 F. Supp. at 1349. Certainly, every dancer has discretion in how she interacts with a customer. This discretion, however, does not reflect economic independence. Instead, it "merely mask[s] the economic reality of dependence." *Id.* Plaintiff was dependent on Defendants' customers and Defendants controlled most of the terms of her interaction with them, including key terms like who she could entertain (only customers The Follies admitted) and the prices she could charge (no less than minimum charge The Follies set).

Defendants repeatedly argue that they exerted less control over Plaintiff than other strip clubs exert over their dancers. They argue, for example, that they did not fine Plaintiff if she was late or wore something they did not like, impose shift requirements, require Plaintiff to perform stage dances, or impose a plethora of written rules. (Dkt. 87-1 at ¶¶ 42, 46, 130.) That may be true. But, no single type of control is required to make someone an employee. Try as they might, they did not, in fact, build the better mousetrap. The undisputed facts of this case show that Defendants exerted significant control over how Plaintiff sold her services at the club.

## 2. Opportunity to Make a Profit/Make a Loss

The second factor is the putative employee's opportunity for profit or loss depending on her managerial skill. Working as an entertainer at The Follies, Plaintiff could profit by selling dances to customers or having them pay her for conversation. That is how she made her money. (Dkts. 97 at 12; 98 at ¶ 44.) Defendants argue that Plaintiff's profits depended on her initiative — that is, they claim she earned more if she hustled more and less if she hustled less. She controlled how she looked, how she danced, and how she interacted with her customers. The more pleasing she was, the more she made. They also note that Plaintiff admitted that, even when the club provided a steady stream of customers, there was no guarantee the customers would pay her to dance. (*Id.*) Some nights she did better than others. Some nights she changed costumes or a wig to make herself more appealing to customers. Sometimes it worked and sometimes it did not. Defendants characterize this as her "managerial skills" under the economic reality test. (Dkt. 97 at 14.)

Certainly, Plaintiff had the ability to earn more tips if she was more appealing to customers. That fact does not distinguish her from a waiter, a bartender, or many other service industry workers typically considered

employees. Moreover, Defendants controlled the club's customers, drawing customers to the club or not. They controlled the location, hours of operation, facilities, music, beverages and food, and number of entertainers. (Dkt. 77 at 21:14–22, 38:9–11; Dkt. 79 at 20:4, 26:10–13, 27:5–10, 73:5–8, 74:1–5; Dkt. 84 at 44:14–22; Dkt. 86-6 at ¶¶ 23–26, 31–33, 58–59.) No matter what she did, she could not earn money in the club unless Defendants provided customers. And as explained above, Defendants set a minimum price at which Plaintiff could sell her services. Defendants' decision to control a key metric — price — further lessened Plaintiff's control over profits and loss. Defendants exerted even more control by deciding not to allow women in the club unless accompanied by a man.

The undisputed facts show that Defendants controlled all aspects of the club's operation and thus were primarily in control of Plaintiff's opportunity to make a profit. *See Vaughn,* 2016 WL 7365201 at *8 (holding that club exercised greater control over opportunity for profit because it controlled advertisements, location, business hours, facilities, and food and drink); *Reich*, 890 F. Supp. at 593 ("[b]ut for defendant's provision of the lavish work environment, the entertainers at the club

would likely earn nothing"). The Court follows a long list of other courts holding that a dancer's ability to "hustle" does not provide him or her a greater control over profit or loss. *Hanson*, 167 F. Supp. 3d at 1331 (noting that "[t]his argument — that dancers can 'hustle' to increase their profits — has been almost universally rejected") (collecting cases).

It is also worth noting that Plaintiff risked far less than Defendants. Her risks consisted of the house fees and the expenses related to make-up, hair, and outfits. (Dkt. 98 at ¶¶ 34, 47.) In contrast, Defendants risked losing the investment of the club's overhead expenses including rent, maintenance, security, insurance premiums, and employee salaries, which totaled over $840,000 a year. (*Id.* at ¶¶ 28–33.) Another court in this district framed this comparison as "[a] dancer risks nothing more than a minor fee, and the club 'would have us believe that a dancer . . . could hang out her own shingle, pay nothing in overhead — no advertising, no facilities, no bouncers — and draw in a constant stream of paying customers.' " *Vaughan*, 2016 WL 7365201, at *8 (quoting *Harrell*, 992 F. Supp. at 1352). That is not the economic reality of the situation here. As the Fifth Circuit noted, in rejecting the same arguments, dancers "are far more closely akin to wage earners toiling for

a living, than to independent entrepreneurs seeking a return on their risky capital investments." *Reich*, 998 F.2d at 327.

The second factor points towards an employee-employer relationship.

### 3. Relative Investment

The third factor is the alleged employee's investment in equipment or materials required for his task, or his employment of workers. Plaintiff invested in the outfits that she wore for entertaining, the upkeep of her hair, and makeup. (Dkt. 98 at ¶¶ 34, 149–152.) This may have cost her "a couple of thousand dollars" a year. (*Id.*) Defendants claim her expenses were higher — maybe $10,000 a year. (*Id.*) They get that calculation by always using the high-end of rough estimates Plaintiff provided about the items she bought and the amount she paid for them. (*Id.*) But, even accepting that exaggeration, the difference is immaterial.

Defendants paid more than $10,000 a month in rent. (Dkt. 86-7 at 8.) They also invested in materials for the building, which included televisions, a music system, a stage, VIP rooms, and the adult entertainment permit. (Dkt. 86-6 at ¶ 19.) They paid liability insurance, building reports, and maintenance, utilities, security, and payroll for

managers, bar, and kitchen staff, floor men, and others. (Dkt. 98 at ¶¶ 28–33; Dkt. 86-7 at 8–9.) It is undisputed that these expenses totaled more than $840,000 in 2016. (*Id.*) Defendants concede they would have been the same each year. (*Id.*)

Defendants argue that the correct analysis is not whether they spent more on the business than Plaintiff, but whether "Defendants' investment into Plaintiff's business was 'material.'" (Dkt. 97 at 18.) Defendants cite *Harrell* for this proposition. That opinion does not support Defendants' argument. To the contrary, the court in *Harrell* used the term "material" to describe the club's investment in advertising, facilities, and maintenance — the same investments Defendants concede they made in this case but try to exclude from the analysis. *Harrell*, 992 F. Supp. at 1350.

Defendants seek to minimize the $10,000 investment they made each month in rent by arguing that the Court should only consider rent applicable to "entertainer-specific areas" — that is, the stage, the dressing room, and the area where the house mom works. Defendants claim this area amounts to only 491 square feet of the entire building, or $734.00 of the $10,000 in monthly rent. Of course, these areas are part

of the overall premises and Defendants cite no authority to suggest the Court should artificially apportion the venue for assessment of each parties' investment in equipment and materials. In addition, dancers are not limited to these areas as it is undisputed that they have free run of the entire space. Private table dances and VIP room dances do not occur in these areas. Indeed, dancers are not even required to dance on the stage. And, as explained above, Defendants argue that Plaintiff and other dancers were not required to entertain customers by dancing but could talk with them, play games with them, or have a drink with them. The point is that the entire building (except perhaps the kitchen and the patrons' bathrooms) was available for dancers to work. There is no basis for apportioning the rent as Defendants suggest.

Similarly, Defendants argue that other expenses related to the operation of the club — like liability insurance, building repair and maintenance, utilities, and payroll — should not be considered because they were only material for the operation as a bar. (Dkt. 97 at 20.) Not true. The dancers had access to nearly the entire building and were integral to the business's operation. All expenses related to the operation of the building were part of Defendants' investment.

Comparing the club's expenses to Plaintiff's expenses, the Court finds — again as nearly every other court has found — that the third factor points towards an employee-employer relationship. *See e.g., Reich,* 998 F.2d at 328 ("A dancer's investment in costumes and a padlock is relatively minor to the considerable investment [the club's owner] has in operating a nightclub" and the nightclub's investment is "obvious."); *Harrell* 992 F. Supp. at 1350 ("The courts which have addressed this factor have universally concluded that a dancer's investment is minor when compared to the club's investment."); *Hanson*, 167 F. Supp. 3d at 1332 (finding dancer's investment in clothing, makeup and costumes minuscule when compared to defendant's investment in adult club).

### 4.    **Special Skill**

The fourth factor is whether the service rendered requires a special skill. Other courts have found that adult entertainers' dancing requires no special skill. *Clincy, Inc.*, 808 F. Supp. 2d at 1348; *Hanson*, 167 F. Supp. 3d at 1332. Defendants do not challenge this finding. (Dkt. 97 at 22.) Courts have also found that an entertainer's ability to manage her career requires no special skill. *Hanson*, 167 F. Supp. 3d at 1331 ("On the business side, to the extent that sort of skill is relevant in this

analysis, little business skills, judgment, or initiative is required to dance at a gentlemen's club that is established and managed by someone else."). The Court finds that the skills entertainers need at The Follies are analogous to entertainers at other clubs. That is, it requires no special skill. The fourth factor weighs in favor of an employee-employer relationship.

### 5. Permanency and Duration of the Relationship

The fifth factor is the degree of permanency and duration of the working relationship. Permanence or a longer duration suggest an employment relationship. Courts have considered the consistency of the work, whether the job was the primary source of employment, and the duration of the relationship. (*Id.* at 1332.) Relationships with a club that extend over one year can signify permanence. *Clincy*, 808 F. Supp. 2d at 1348.

Plaintiff argues that the permanence factor weighs in her favor. She worked at The Follies from around November 2010 until April 2014. (Dkt. 86-6 at ¶ 5.) While records were not available throughout the entire time, records from her last six and a half months at the club show that she worked ninety-eight shifts during that time, averaging nearly 3.5

shifts per week. (*Id.* at ¶ 7.) Defendants respond that this is not an impressive amount and that Plaintiff also worked at other clubs during this time. They claim her concurrent performance at other clubs shows a lack of economic dependence on them. (Dkt. 97 at 22.) Defendants' argument fails on both accounts. Working at other clubs does not diminish Plaintiff's relationship with The Follies. Many people are employed at two jobs. *McFeeley,* 47 F. Supp. 3d at 272 ("The fact that dancers can work at other clubs [does] not distinguish them from countless workers . . . who are undeniably employees under the FLSA — for example, waiters, ushers, and bartenders — that may simultaneously work for other businesses.") (internal quotations omitted). And Plaintiff's varied schedule does not diminish her permanence at the club. Ninety-eight shifts over a six-month period requires consistent presence at the club.

Courts have noted that "nude entertainers tend to be transient or itinerant." *Clincy*, 808 F. Supp. 2d at 1348. As a result, "courts have found that the duration/lack of permanence factor is entitled to only modest weight in assessing employee status under the FLSA." *Hanson*, 167 F. Supp at 1332 (internal quotations omitted). As Plaintiff performed

at the club for an extended period of time and performed regularly during a six-month period of time, the permanence factor, though given comparatively less weight, still weighs in favor of finding an employee-employer relationship.

### 6.    Integral Part of Alleged Employer's Business

The sixth factor is the extent to which the service rendered is an integral part of the alleged employer's business.  Defendants argue that entertainers are not integral to the business of The Follies because the club "is not a traditional strip club with a traditional strip club business model."  (Dkt. 97 at 23.)  Instead, The Follies provides "a variety of entertainment options packaged in a friendly, neighborhood dive bar environment." (*Id.*)  Defendants acknowledge that other defendants have made similar arguments in similar cases, and that courts have consistently rejected those arguments.  (*Id.* at 23.)

Defendants argue that the test about whether the presence of entertainers are integral to the business is "whether [The] Follies <u>needs</u> entertainers." (*Id.* at 24.)  Defendants offer no citation for this conception of "integral," and, notably, the recent cases that have addressed this issue have looked at whether the business would not exist without the presence

of nude entertainment. Other clubs with adult entertainment have made similar arguments, but courts have rejected these arguments as absurd. *See Clincy*, 808 F. Supp. 2d at 1348 (rejecting the argument that entertainers were not integral to a club because the entertainers were "not it's [sic] essential function"). "Exotic dancers are obviously essential to the success of a topless nightclub." *Vaughan,* 2016 WL 7365201, at *10 (quoting *Harrell*, 992 F. Supp. at 1352).

Whether The Follies would or would not exist without nude dancers is a purely theoretical question. That it has had nude dancing for twenty-five consecutive years — its entire existence — is an empirical fact. (Dkt. 98 at ¶ 60.) The sign outside the club includes its logo, the word "Follies" below a pair of legs wearing underwear and high heels:



(*Id.* at ¶ 62.)[8] One of the owners designed the club so that the club's two stages would be visible "from the bar area and all four corners of the room." (*Id.* at ¶¶ 20-21.)[9] In other words, the owner wanted to make sure the dancers could be seen from everywhere in the building. On Monday, Tuesday, and Wednesday nights, The Follies had between 60 and 80 dancers, and on Thursday, Friday, and Sunday nights, it had between 100 and 120 dancers. (Dkt. 79 at 22:5–22.) The day shifts had similar numbers. (*Id.*) "Based upon the record as a whole, a reasonable juror could not find that the presence of nude entertainment is not integral to the Club." *Clincy*, 808 F. Supp. 2d at 1349. The sixth factor weighs in favor of an employer-employee relationship.

### 7. Weighing the Factors

The Court finds that every factor points towards an employee-employer relationship, and thus that Defendants misclassified Plaintiff

---

[8] Defendants argue that the legs on this sign could also be interpreted to be wearing a garter belt. (Dkt. 98 at ¶ 2.) The Court is unsure that this alleged distinction makes a difference.

[9] Defendants argue that the club layout tracked a previous use of the space. When questioned, however, if the club was "designed so that you could see the stages from everywhere," Defendant White responded, "[f]rom the bar area and all four corners of the room, yes." (Dkt. 78, 35:5–9.)

as an independent contractor.  Perhaps Defendants are correct and they had less control over Plaintiff than other strip clubs had over their dancers, but Defendants still maintained significant control over Plaintiff and her ability to make money.  Furthermore, when considered together, the conditions under which Plaintiff performed show that Plaintiff depended economically on Defendants.  This economic dependence — as well as the other facts discussed above — leads the Court to conclude that Plaintiff was an employee entitled to protections of the FLSA.

## B.    Defendants White and Youngelson as "Employers"

In addition to suing WBY, Inc., Plaintiff sued Defendants White and Youngelson individually.  The individual Defendants moved for summary judgment arguing that they did not employ Plaintiff.

Defendants White and Youngelson cannot be held liable for violating the FLSA's unless they are "employers" within the meaning of the act.  *Alvarez Perez v. Sanford–Orlando Kennel Club, Inc.,* 515 F.3d 1150, 1159 (11th Cir. 2008) (citing 29 U.S.C. § 207(a)(1)).  The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).

To determine whether an individual is an employer under the FLSA, the court must consider the facts of the case "in light of the 'economic reality' of the relationship between the parties." *Villarreal v. Woodham,* 113 F.3d 202, 205 (11th Cir.1997) (quoting *Goldberg v. Whitaker House Co-op., Inc.,* 366 U.S. 28, 33 (1961)). "To be personally liable, an officer must either be *involved in the day-to-day operation* or have some *direct responsibility for the supervision of the employee." Id.* at 638 (emphasis added). Whether an individual falls within the definition of an employer "does not depend on technical or isolated factors but rather on the circumstances of the whole activity." *Alvarez Perez*, 515 F.3d at 1160 (internal quotations omitted).

The Eleventh Circuit has also recognized that "the overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Patel,* 803 F.2d at 637–38 (internal quotations omitted). There can be several simultaneous employers of any individual worker. *Falk v. Brennan,* 414 U.S. 190, 195 (1973). And "if an individual with managerial responsibilities is found to be an employer under the FLSA,

that individual can be found joint and severally liable for violations of that Act." *Stout v. Smolar*, No. 1:05-cv-1202, 2007 WL 2765519, at *5 (N.D. Ga. Sept. 18, 2007).

An analysis of the guidance set forth by the Eleventh Circuit demonstrates that Defendants White and Youngelson were employers along with WBY, Inc.  First, and most importantly, Defendants White and Youngelson decided not to classify Plaintiff as an employee and pay her a wage.  Instead, they decided WBY, Inc. would treat her (and presumably all other dancers) as an independent contractor — the decision that violated the FLSA.  (Dkt. 86-5 at ¶¶ 9–10.)  That the individual defendants controlled the club's decision to misclassify Plaintiff provides significant reason to consider them employers.  *See Stuart v. Resurgens Risk Mgmt., Inc.,* No. 1:11-cv-04251, 2013 WL 2903571, at *12 (N.D. Ga. June 12, 2013) ("[E]mployer status under the FLSA is most strongly demonstrated where the individual has control over the policies or conduct that allegedly violates the FLSA.").

The individual defendants also admit that they set up The Follies when it opened twenty-five years ago and operated it before stepping away in more recent years.  The undisputed evidence shows that they

were sufficiently involved in the business and its day-to-day operations to be considered Plaintiff's employer. Defendants White and Youngelson selected the manager of the club. (Dkt. 78 at 9:10–12.) By their own admissions, they also maintained "active oversight." (*Id.* at 31:5-9; 78-3 at 4; 79 at 68:20-25; 79-9 at 4.)[10] In a 2015 disclosure to the Bankruptcy Court, Defendant White disclosed that both Defendants White and Youngelson "continue in active oversight of the operations, financial matters, legal affairs[,] and the general business of [The] Follies." (*Id.*)

This statement is supported by their behavior. Defendant Youngelson receives nightly text messages from the manager regarding club revenue. (Dkt. 77 at 37:21–38:8.)[11] Defendant White goes to the club twice a week to make sure that the club is in a satisfactory condition. (Dkt. 78 at 21:5–10.) These visits can include conversations with The

---

[10] Defendants dispute this point, saying that "the testimony cited by Plaintiff simply acknowledges that the quoted verbiage can be found in WBY's Disclosure statement filed with the Bankruptcy Court." (Dkt. 98 at ¶ 80.) It is unclear why the Court would not consider quoted testimony from a disclosure statement on Defendants' roles within the club. Furthermore, the facts underlying this statement are supported by the facts within the case.

[11] Defendants argue that this statement is "immaterial insofar as it establishes the extent of Youngelson's control or involvement in Follies' day-to-day operations." (Dkt. 98 at ¶ 69.) The Court disagrees.

Follies' managers in which they discuss "what they're doing right, doing wrong, and what can be improved." (*Id.* at 24:21–24.) Furthermore, Defendant "White is responsible for selecting and supervising management of daily operation and for providing operational insight and direction on major policy decisions for [WBY]." (*Id.* at 31:20–24.) These Defendants' presence and oversight show that they continued to be involved in the day-to-day operation of the club. The level of control they exerted over the business supports the finding that both individual Defendants were employers as defined under the act. *See Donovan v. Grim Hotel Co.*, 747 F.2d 966, 971 (5th Cir. 1984) (finding that the owner of a chain of hotels was an employer because he personally selected the manager of every hotel, solved the hotels' major problems, and the hotels, "speaking pragmatically, were [defendant's] and functioned for the profit of his family").

Defendants' ownership interests also support this conclusion. *See Shultz v. Mack Farland & Sons Roofing Co.*, 413 F.2d 1296, 1299–1300 (5th Cir. 1969) (finding that despite putting the company "under the immediate management of various supervisors during the three or four years preceding the trial," the defendant still "retained ultimate control

over their operations because his ownership interest did not diminish at all, he still maintained an office, and he exercised supervisory authority on the hiring and firing of supervisory personnel); *Dole v. Simpson*, 784 F. Supp. 538, 545 (S.D. Ind. 1991). White and Youngelson each own 50% of WBY, and, as stated above, continue to have significant influence over the day-to-day operation of the club. (Dkt. 98 at ¶¶ 67, 79.)

White and Youngelson each have two children on The Follies payroll. All four have squishy responsibilities. Defendant Youngelson, for example, explained that his son and daughter work there. When asked what their roles were, he responded "Whatever I want it to be." (Dkt. 79 at 39:12–14.) He then explained:

> They do whatever I ask them to. They're my — They're my eyes and ears and [Defendant White's] kids are his — are our eyes and ears. They check what — the boys will come in like different times and report to us who's working, who's not. Brett does a little work in the valet, they do maintenance, they — they explain — the girls explain music to me. Whatever they want, I mean, go do this, okay, that's it.

(Dkt. 79 at 39:16–23.) When asked who gave them the jobs, he stated "[Defendant White] and I. It's our business. I'll pay anybody I want." (*Id.* at 40:1–3.) Defendant White also testified that he hired his children, saying that they are salaried employees involved in maintenance. (Dkt.

77 at 8:6–16.)  Defendant White and Youngelson argue that their children's involvement is irrelevant.  The Court disagrees.  The fact that they can place four children on the company's payroll to be their "eyes and ears" shows a continued level of control over the company as well as their desire to maintain control over its day-to-day operations.

The Court notes that some factors found relevant in similar cases are not firmly established here.  Youngelson and White were not involved in the recruitment of entertainers.  *De Leon-Granados v. Eller & Sons Trees*, Inc., 581 F. Supp. 2d 1295, 1303 (N.D. Ga 2008), the sales or marketing of the business, *Coppage v. Bradshaw*, 665 F. Supp. 2d 1361, 1364 (N.D. Ga. 2009), and did not give specific instructions to employees. *Reich*, 998 F.2d at 329.[12]  Plaintiff did not think of either Youngelson or Hurst as her boss.  *See De Leon-Granados*, 581 F. Supp. 2d at 1305.[13] Even so, these factors are not prerequisites to finding White and

_____

[12] Plaintiff disputes this fact, pointing to White's testimony in which he said he would give instructions as he saw fit.  (Dkt. 78 at 21:5–10.)

[13] Defendants' citation to the *Santos* case is also unavailing.  In *Santos v. Cuba Tropical, Inc.*, 829 F. Supp. 2d 1304, 1306 (S.D. Fla. 2011), the plaintiffs could only show that the owner hired the managers and could potentially exert control because of his ownership stake.  *Id.* at 1312.  In this case, the evidence shows Youngelson and White, in fact, continue to exercise significant control over The Follies.

Youngelson employers. This test "does not depend on technical or isolated factors but rather on the circumstances of the whole activity." *Perez*, 515 F.3d at 1159.

Defendants make several more arguments. Defendants argue that, because the club has an operations manager, they were not involved in day-to-day operations. (Dkt. 95 at 4.) "While this evidence may indicate that [the manager] exercise[d] some authority over the Club, it fails to create an issue of fact with regard to whether [the club owners] also exercise[d] authority over the day-to-day operations of the Club and supervise[d] the entertainers." *Henderson v. 1400 Northside Drive, Inc.*, No. 1:13-cv-3767, 2016 WL 3125012, at *3 (N.D. Ga. June 3, 2016).

Defendants White and Youngelson argue that, although they had the authority to exercise more operational control, they did not do so, thus preventing them from being considered employers. *Patel*, 803 F.2d at 638; (Dkt. 88 at 10.) Defendants' decision not to control every aspect of the club's operations does not preclude them from being found to be employers.

Defendants White and Youngelson argue that, although they set the cover charge, decided not to admit female customers who were not

accompanied by a man, determined the hours of operation, and set the minimum charges for dances, they did all of this when the club first opened. They claim, therefore, that these facts cannot be considered when assessing their supervisory role during Plaintiff's employment. (Dkt. 100 at 2.) They cite *Alvarez Perez* in support of their contention. But, in that case, the evidence showed that — while the defendant established policies when the company began — he later had a heart attack, stopped coming to the facility more than once a year, and turned operations over to his son. *Alvarez Perez*, 515 F.3d at 1161. In contrast, Youngelson and White have maintained an active presence at the club. Their continued presence at the club, along with the continued binding nature of these policies, show continued control over the day-to-day operation of the club.

### C. Unopposed Motions for Summary Judgment

Plaintiff's motion for summary judgment raises three issues that Defendants do not oppose. These issues are whether WBY qualifies for enterprise coverage, whether Plaintiff qualifies for the creative professional exception to the FLSA's minimum wage requirement, and whether WBY can offset its minimum wage obligations.

In unopposed motions for summary judgment, "the district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion." *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004). The court need not review all the evidentiary materials *sua sponte*, but the court must make sure that the order is supported at least by the evidentiary materials submitted in support of the order. *Id.*

### 1. Enterprise Coverage

If an employer qualifies for either individual or enterprise coverage, then the employer assumes minimum wage requirements under the FLSA. 29 U.S.C. § 206(a). Plaintiff moves for summary judgment on whether WBY qualifies for enterprise coverage. Defendants do not dispute this issue.

Under the FLSA, employers must pay the statutorily required minimum wage to "each of [its] employees who in any workweek is (1) engaged in commerce or in the production of goods for commerce ['individual coverage'], or . . . (2) employed in an enterprise engaged in commerce or in the production of goods for commerce ['enterprise

coverage'].” *Henderson*, 2014 WL 3767798, at *1 (quoting 29 U.S.C. § 206(a)). Employers fall within the FLSA's enterprise coverage section if they “(1) [have] employees engaged in commerce or in the production of goods for commerce, or [have] employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person and (2) [have] at least $500,000 of ‘annual gross volume of sales made or business done.” *Polycarpe v. E & S Landscaping Service, Inc.*, 616 F.3d 1217, 1220 (11th Cir. 2010) (quoting 29 U.S.C. § 203(s)(1)(A)). “Commerce” within the FLSA means “trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof.” 29 U.S.C. § 203(b).

Plaintiff alleges that “Defendant WBY, Inc. was an enterprise engaged in commerce or the production of goods for commerce within the meaning of the FLSA in calendar years 2012, 2013[,] and 2014.” (Dkt. 86-6 at ¶ 1.) Defendants do not dispute this assertion. (Dkt. 98 at ¶ 1.) The record also establishes that WBY has employees engaged in commerce and has at least $500,000 of annual gross volume of sale made

or business done. (*Id.* at ¶ 1; Dkt. 87-1 at ¶ 20.) Accordingly, the Court rules that WBY is an enterprise under the FLSA.

## 2. Creative Professional Exception

The Creative Professional Exception provides that employers do not have to pay the minimum wage to professionals that fall within the definition of a "creative professional." 29 C.F.R. § 541.302(a). Plaintiff moves for summary judgment, asserting that she does not qualify as a creative professional. (Dkt. 86-7.) Defendants do not contest this issue.

To qualify for the "creative professional" exception, the employer must compensate on a fee basis at a rate of at least $455 per week and the employee's primary duty is the performance of work "requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor." *Henderson,* 110 F. Supp. 3d at 1321 (quoting 29 C.F.R. § 541.300(a)). "The exemption does not apply to work which can be produced by a person with general manual or intellectual ability and training." *Id.* The test for this exception must be applied case-by-case. *Id.* Other courts that have analyzed similar factual circumstances have found that adult entertainers do not qualify for the creative professional exception. *Dean v. 1715 Northside Drive, Inc.,* 224

F. Supp. 3d 1302, 1323 (N.D. Ga. 2016); *Henderson*, 110 F. Supp. 3d at 1321; *Harrell*, 992 F. Supp. at 1355.

This Court agrees. Managers at The Follies do not select entertainers based on their dancing skill. (Dkt. 98 at ¶ 39.) Instead, managers select entertainers based on whether the manager believes the entertainer will spark customers' interest. (*Id.* at ¶ 37.) The manager makes this determination based on a combination of the entertainer's attractiveness and personality. (*Id.* at ¶ 39.) Dancers need not dance for the manager before they may dance at The Follies. (*Id.* at ¶ 40.) Customers often pay for time in conversation. (*Id.* at ¶ 43.) The Court finds that Plaintiff's job at The Follies does not require the applicable invention, imagination, or originality, and, as a result, Plaintiff does not qualify for the "creative professional" exception.[14]

### 3. Offsetting Minimum Wage Obligations

Plaintiff moves for summary judgment on whether Defendants have an offset defense. (Dkt. 86-6.) Defendants do not challenge this

---

[14] The Court means no disrespect to hard-working people in Plaintiff's industry. They simply do not meet the FLSA's definition of a "creative professional."

issue.  The FLSA allows employers to use service charges to offset the employer's obligations to pay employees.  29 C.F.R. § 531.55(b).  Service charges are "sums that are distributed by the employer to its employees," 29 C.F.R. § 531.55(b), while tips, in contrast are "sum[s] presented by a customer as a gift or gratuity in recognition of some service performed for him." 29 C.F.R. § 531.52.  To be a service charge, the fee must be (1) recorded in a company's gross receipts, and (2) distributed by the company to the employee.  *Henderson*, 110 F. Supp. 3d at 1322.

The fees that Plaintiff received from customers of The Follies were tips, not service charges.  First, WBY does not record any of the payments that it makes to entertainers by customers.  (Dkt. 98 at ¶¶ 92–93, 95–96, 98–100.)  Second, the fees that customers pay dancers go directly from customers to dancers.  (*Id.* at ¶ 97.)  The company does not distribute these fees to the employee.  (*Id.*)  As a result, under the FLSA, the fees that go from the company to the entertainers are tips and not service charges.  The Court finds Defendants are not entitled to offset their minimum wage responsibilities with the tips that Plaintiff received.

### D. Defendants Violated the FLSA's Minimum Wage Provisions

Plaintiff moves for summary judgment on whether Defendants have violated the FLSA's minimum wage provisions. Defendants contest this issue. The FLSA requires that employers pay the minimum wage to employees. To fall under the FLSA's requirements, the employer must have employees and these employees must be engaged in commerce. 29 U.S.C. § 206(a) ("Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages. . . ."). The Court, above, found that Plaintiff was an employee. Defendants admit that WBY is an enterprise, and under the FLSA's definition, any enterprise must have employees that are engaged in commerce. Defendants also admit that they did not pay Plaintiff wages for the time in which she worked at The Follies. The Court finds that Defendants have violated the FLSA's minimum wage provisions.

Defendants make two arguments. First, Defendants claim that Plaintiff has failed to assert the elements of a minimum wage violation. Defendants point out that "a failure to pay wages for all the hours worked

will only result in a minimum wage violation when the total amount falls below the amount of wages guaranteed under the FLSA." (Dkt. 95 at 7) (citing *Arriaga-Zacarias v. Lewis Taylor Farms, Inc.*, No. 7:08-cv-32, 2008 WL 5115005, at *2–3 (M.D. Ga. Dec. 4, 2008)). Defendants' analysis errs because, although Plaintiff may have taken home more than the minimum wage during some weeks in which she worked, this money consisted of tips that she earned from dances and otherwise entertaining The Follies' customers. The proper inquiry is not whether her take-home pay (including tips) was more than the minimum wage, but whether Defendants paid her up to or above the minimum wage. 29 U.S.C. § 206(a). Plaintiff has persuaded the Court that she was entitled to wages that Defendants never paid.

Defendants also argue that Plaintiff bears the burden of identifying the workweeks in which she was "inadequately compensated." (Dkt. 95 at 6.) To establish a prima facie case of an FLSA violation, Plaintiff must show "as a matter of just and reasonable inference" the amount and extent of her work to show that her employer inadequately compensated her under the FLSA. *Rance v. Rocksolid Granit USA., Inc.*, 291 F. App'x 1, 2 (11th Cir. 2008). Defendants claim that the only time that Plaintiff

submitted adequate amount and extent of work were from the period kept track of under the DJ logs. (Dkt. 95 at 6.) Defendants assert that claims relating to all other time periods should be dismissed. (*Id.*) In Plaintiff's deposition, however, Plaintiff claims that she worked from November 2010 through April 29, 2014. (Dkt. 86-1 at ¶ 3.) As Defendants did not pay Plaintiff any wages by The Follies during that time, Plaintiff can reasonably show that Defendants did not compensate her under the FLSA. A jury must now determine how many hours Defendants did not pay Plaintiff.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiff's Motion for Partial Summary Judgment (Dkt. 86) and **DENIES** Defendants' Motion for Summary Judgment (Dkt. 87).

**SO ORDERED** this 28th day of January, 2019.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE